GLENN B. McCORMICK
Acting United States Attorney
District of Arizona
BEVERLY K. ANDERSON
Arizona State Bar No. 010547
NICOLE P. SAVEL
Arizona State Bar No. 015958
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
Email:  Bev.Anderson@usdoj.gov
Email:  Nicole.Savel@usdoj.gov

JOHN C. DEMERS
Assistant Attorney General
U.S. Department of Justice
National Security Division
ALICIA H. COOK
DANIELLE S. ROSBOROUGH
Trial Attorneys
Counterterrorism Section
National Security Division
950 Pennsylvania Ave, NW
Washington, DC 20530
Telephone:  202-514-0110
Email:  Alicia.cook2@usdoj.gov
Email:  Danielle.Rosborough@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Ahmed Mahad Mohamed, et al.,<br><br>                    Defendant. | CR19-02162-TUC-JGZ(EJM)<br><br>GOVERNMENT'S MOTION FOR PROTECTIVE ORDER PURSUANT TO FED. R. CRIM. P. 16 |

The United States of America, by and through its undersigned attorneys, respectfully moves the Court for a protective order in this matter regarding the testimony of certain undercover employees ("UCE") and online covert employees ("OCE") who the United States anticipates calling at trial.  The United States seeks an order for reasonable precautions to protect these witnesses' identities that is consistent with the defendant's

Sixth Amendment rights. These precautions are necessary to protect the safety of the witnesses and to preserve their ability to continue critical work on behalf of the United States.[1] None of the requested procedures will prevent the defendant from effectively cross-examining the witnesses nor infringe on their Confrontation rights. As such, the government respectfully requests the court approve the proposed order for the protective measures discussed below. The Government has conferred with counsel for the defendants regarding their respective positions on the motion and proposed order.  Counsel for defendant Mohamed indicated he objects in part and counsel for defendant Hussein stated he needs additional time to consider the proposed protections.

### FACTUAL BACKGROUND

Ahmed Mahad Mohamed ("Mohamed") and Abdi Yemani Husseinn ("Hussein") are charged with conspiring to provide and attempting to provide material support to a designated foreign terrorist organization, namely ISIS, in violation of 18 U.S.C. § 2339B.

As alleged in the Complaint, the FBI initiated an investigation into Mohamed in August of 2018 based on information that indicated Mohamed wished to provide material support to ISIS. On August 13, 2018, Mohamed, using the name "Abu Dujana", initiated contact with an FBI Online Covert Employee ("OCE"). In the course of their conversations, Mohamed told the OCE that Mohamed was an ISIS supporter, that he wanted to make "hijrah" to join ISIS, and that he wanted to carry out beheadings and achieve martyrdom.

In December of 2018, Mohamed was introduced to an FBI Undercover Employee ("UCE"). Mohamed and the UCE spoke on social media and Mohamed again expressed his interest in traveling to Syria, Egypt or Iraq to join ISIS and behead disbelievers. Throughout their online conversations, Mohamed repeatedly expressed his desire to engage in acts of violence, stating, among other things:

---

[1] The government incorporates by reference here the Government's *Ex Parte* and *In Camera* Motion for a Protective Order Pursuant to CIPA Section 4 and Fed. R. Crim. P. 16(d)(1) and the classified declaration from Jill Sanborn, the Assistant Director of the FBI's Counterterrorism Division. *See* DE 67, 69.  The motion and declaration sets forth additional factual information for the implementation of the requested protective measures during the testimony of the witnesses.

- "I want to be the new jihadi John akhi beheading the kuffar like animal"
- "If this kuffar stop me I will make attack with truck or anywhere that can kill so many kuffar"
- "The best wakeup call is Islamic State to get victory or another 911"
- "[I]f I go to Syria I want to be the behading person wallahi this kuffar I want to kill them so many I am thirsty their blood."

Mohamed told the UCE that he had saved $2,000 and sent screenshots of flight information from the United States to Turkey. Mohamed also stated that he "keep[s] watching Islamic state video" and that he read ISIS's *Rumiyah* magazine every day.

On February 1, 2019, Mohamed met the UCE in person. During that meeting, Mohamed told the UCE that he wanted to make hijrah to join ISIS.  After that meeting, Mohamed and UCE continued to communicate online.  Mohamed shared photos of his search for immigration travel documents (including a Form I-131) and his plan to visit a humanitarian agency offering immigration services.

On March 12, 2019, Mohamed met with the UCE in person again.  This time, Hussein was with him.  Mohamed, Hussein, and the UCE discussed their radical ideology, their desire to travel to the Middle East to make hijrah, and their desire to achieve martyrdom. During this conversation, Mohamed and Hussein also discussed homeland attack ideas.

In April of 2019, Mohamed informed the UC that he had applied for his I-131 Immigration Travel Document. On April 12, 2019, the FBI confirmed that MOHAMED had applied on April 5, 2019 and paid the $220 fee. On April 22, 2019, Mohamed met with the UCE again.  Mohamed told the UCE that he had applied for his I-131 travel document and showed the UCE his bank statement as evidence that he was saving to purchase a flight to make hijrah.  Mohamed also proposed cover stories for their proposed travel to join ISIS. Once again, Mohamed expressed his desire to engage in violence, telling the UCE that jihad was the only thing on his mind, that he wanted to make the kuffar in Egypt cry, and that "even when I kill them, I want to behead them."

- 3 -

In May of 2019, Mohamed confirmed he would still travel overseas to join ISIS even if the UCE could not travel with him. During subsequent conversations with the UCE, Mohamed told the UCE that he was with Hussein and that Hussein wanted to make hijrah. On May 28, 2019, Mohamed told the UCE that Hussein had submitted paperwork for Hussein's travel documents.  Mohamed stated that he was saving money to help Hussein purchase a plane ticket.

On June 24, 2019, Mohamed and Hussein met with the UCE.  Hussein stated that he wanted to make hijrah as soon as possible, that ISIS was the best, and that when he arrived in Sinai, he needed blood on his hands.  Hussein said he would "kill so many people" and that he wanted to "be on the front line."  Hussein also stated that he wanted to blow up the White House and that he wanted to travel around the world and "make explosion."  Mohamed indicated that he and Hussein wanted to be the most wanted terrorists in the world.  Mohamed and Hussein also discussed the cover story for their travel to join ISIS and Mohamed gave the UCE his travel documents to keep because Mohamed did not trust his family.

On June 26, 2019, Mohamed told the UCE that he and Hussein had been going to the gym to get strong so they could "behead those kuffar." On July 10, 2019, Mohamed told the UCE that Hussein had received confirmation that his immigration paperwork was processing. On July 16, 2019, Hussein contacted the UCE to tell the UCE that he had an appointment with immigration services for an emergency travel document. The FBI confirmed the submission of Hussein's application on July 18, 2019. On July 19, 2029, Hussein met with a representative of the United States Citizenship and Immigration Services and relayed a false story about the purpose of his travel to Egypt. On July 24, 2019, Mohamed informed the UCE that he had sold one of his cars for $4,500. On July 25, 2019, Mohamed informed the UCE that he and Hussein had purchased airline tickets to Egypt. On July 26, 2019, Mohamed, Hussein, and the UCE drove to the airport together where Mohamed and Hussein were arrested after they checked in, were provided boarding passes and were waiting to board the plane.

## PROTECTIVE MEASURES SOUGHT

Based on the need to protect the OCE's and UCE's true identities and physical characteristics from disclosure, and the need to protect other investigations, the United States respectfully submits that there are certain measures the Court may and should adopt pertaining to the testimony of these witnesses at trial. As set forth more fully below, the proposed security measures are narrowly tailored to safeguard the security of the witnesses and the integrity of other investigations, while simultaneously safeguarding the defendants' right to a fair trial under the Sixth Amendment. Specifically, the United States requests the Court implement the following measures with respect to the undercover witnesses:

1. Allow the UCE and OCE to testify under pseudonyms;
2. Prohibit the defense from asking the UCE and OCE questions that reveal personally identifiable information or could lead to the discovery of their true identities;
3. Allow the UCE and OCE to testify wearing light disguises;
4. Allow the digital obscurity of the facial image of the UCE and OCE on any recorded video footage played over the CCTV feed during court proceedings;
5. Prohibit the public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the UCE and OCE;
6. Prohibit all non-official recording and photographic devices from the courtroom during the testimony of the UCE and OCE, as well as the courtroom in which the feed is shown during the UCE and OCE's testimony; and
7. Allow the UCE and OCE to use non-public entrances and exits to the courthouse and courtroom;
8. Prohibit any questioning by the defendant that would reveal the nature or extent of the FBI's use of UCEs and OCEs or the FBI's UCE/OCE program.

## ARGUMENT

The government seeks limited measures to protect the safety of UCES and OCES who will be testifying at a public trial. The Confrontation Clause of the Sixth Amendment

guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him."  U.S. Const. amend VI.  The Supreme Court has derived two main purposes of the Confrontation Clause: (1) the defendant's right to cross-examine the witnesses against him: "Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); and (2) the defendant's right to physically confront a witness: The Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).

The "elements of confrontation—physical presence, oath, cross examination, and observation of demeanor by the trier or fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo American criminal proceedings." *Maryland v. Craig*, 497 U.S. 836, 846 (1990). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16, (1974). Cross-examination allows a criminal defendant to test the believability of a witness and the truth of the witness' testimony in several ways, including by "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id*. at 316.

Thus, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (cleaned up).  The Sixth Circuit has explained that "prototypical forms of bias include the witness's own inconsistent statements, the witness's criminal history or status as a parolee or probationer, any immunity or plea deals between the witness and the state, and other prejudices, or ulterior motives from which jurors could appropriately draw inferences relating to the reliability of the witness." *United States v. Givhan*, 740 F. App'x 458, 461

1    (6th Cir. 2018) (cleaned up).

2          However, the right of confrontation is not absolute and must "bow to accommodate

3    other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S.

4    284, 295 (1973).  Accordingly, trial judges possess "wide latitude to impose reasonable

5    limits on such cross-examination based on concerns about, among other things,

6    harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

7    repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

8    "So long as cross-examination elicits adequate information to allow a jury to assess a

9    witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised

10   by a limitation on cross-examination." *United States v. Callahan*, 801 F.3d 606, 624 (6th

11   Cir. 2015) (quoting *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998)); *see also*

12   *United States v. Givhan*, 740 F. App'x 458, 461–62 (6th Cir. 2018) (no confrontation clause

13   violation based on limitations placed "on otherwise permitted cross-examination" when

14   "the jury had enough information . . . to assess the defense theory of bias or improper

15   motive.") (quoting *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000)); *see also United*

16   *States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983) ("The rule is that once cross-

17   examination reveals sufficient information to appraise the witnesses' veracity,

18   confrontation demands are satisfied.") (citing *United States v. DeLuca*, 692 F.2d 1277,

19   1282 (9th Cir. 1982)).

20          Accordingly, instead of a fixed rule, when considering restrictions on cross-

21   examination, courts have engaged in a case-specific analysis, "balancing interests in the

22   relevant case-specific context." *United States v. Celis*, 608 F.3d 818, 833 (D.C. Cir. 2010);

23   *see also United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011). Courts likewise

24   retain wide discretion in moderating discovery when appropriate. *See* Fed. R. Crim. P.

25   16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or

26   inspection, or grant other appropriate relief.").

27          The limitations requested in this case are necessary to ensure the safety of the UCE

28   and OCE and will help to ensure the viability of ongoing and future investigations.

Moreover, because the witnesses will be physically present, testifying under oath, subject to cross-examination on the relevant issues, and observable by the jury, the purpose of the Confrontation Clause is satisfied even with the requested protections. *Maryland v. Craig*, 497 U.S. 836, 846 (1990). Notably, the protections sought in this matter are nearly identical to procedure employed in terrorism trials across the country.

> **A.    Use of Pseudonyms and Prohibition against Eliciting Personal Identifying Information**

In the context of the Confrontation Clause, testimony under pseudonym may violate a defendant's rights when it interferes with the efficacy of cross-examination; however, when the pseudonym is "no more than a mere curiosity" it "possess[es] no constitutional significance." *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992). In *Smith v. Illinois*, 390 U.S. 129, 130-133 (1968), the Supreme Court found that preventing the defense from learning the real name of a government informant, the principal prosecution witness, on cross-examination violated the defendant's Sixth Amendment right to confrontation. Since then, courts around the country, including the Ninth Circuit, have held that *Smith* "does not establish a rigid rule of disclosure, but rather discusses disclosure against a background of factors weighing conversely, such as personal safety of the witness." *United States v. Rangel*, 534 F.2d 147, 148  (9th Cir. 1976) (quoting *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974) (affirming the district court's decision to allow the witness to withhold his name upon representation that threat had been made to his life); *see also United States v. Ellis*, 468 F.2d 638, 639 (9th Cir. 1972) (affirming the decision of the district court to allow the witness to refuse to give his name during cross-examination when the prosecution gave "substantial reasons for withholding information to protect the agent from harm."); *United States v. Mohamud*, No. 10-cr-00475-KI (D. Ore. Dec. 19, 2012), ECF Nos. 233, 341 (allowing undercover FBI agents to testify using pseudonyms) *aff'd United States v. Mohamed Osman Mohamud*, 666 Fed. App'x 591, 594 (9th Cir. 2016).

Like the Ninth Circuit, courts around the country routinely permit government witnesses to testify under pseudonym when the government interest in protecting the

witness from harm outweighs the defendant's interest in learning the witness's true name. *See Brown v. Kuhlmann*, 142 F.3d 529, 533 n.3 (2d Cir. 1998) (allowing an undercover detective to testify in a closed courtroom using his badge number instead of his name due to safety concerns); *United States v. Palermo,* 410 F.2d 468, 472 (7th Cir. 1969) (finding that "where there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute."); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490 (S.D.N.Y. 2018) (approving "pseudonymous testimony by a UC as a means of protecting a UC's safety and ability to continue to work as such.") (cleaned up); *United States v. Dumeisi*, No. 1:03-cr-00664 (N.D. Ill. Jan. 2, 2004), ECF Nos. 75, 83 (former member of Iraqi Intelligence Service allowed to testify using a pseudonym and could not be questioned about his current or former address) ), *aff'd*, 424 F.3d 566 (7th Cir. 2005); *United States v. Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) (finding need to protect UC–188's personal safety and the viability of his current and future undercover investigations was sufficient basis to allow pseudonymous testimony when "nothing about UC–188's real name goes to his credibility or knowledge regarding the subject of his testimony."); *Alvarado v. Burge,* 2006 WL 1840020, at *2 (S.D.N.Y. June 30, 2006) ("Testifying by giving an identifying number rather than a name does not necessarily curtail any trial rights. The cross-examiner can question the witness' activities [at issue] without regard to the witness' name."); *Nelson v. Crowley,* 2009 WL 498909, at *13-17 (S.D.N.Y. Feb.23, 2009) (finding defendant's argument "that disclosure of the names of key witnesses is required in all instances" had "no support in the law," and that the Confrontation Clause did not require defendant receive the undercover officer's name in order to facilitate cross-examination bearing on his general credibility).

In a similar vein, where there is a "threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (citing *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969); *see also Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992); *United States v. Contreras*, 602 F.2d 1237, 1239-40 (5th Cir. 1979) (where

there was reasonable fear the disclosure of DEA agent's home address would endanger him, no error in precluding cross-examination as to home address and other background information even though agent was "instrumental in defendant's arrest"); *Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); *United States v. Celis*, 608 F.3d 818, 832-34 (D.C. Cir. 2010) (finding allowing witnesses testifying in a trial against members of the FARC, a terrorist organization, that a protective order allowing government witnesses from Colombia to testify under pseudonyms, and limiting disclosure of their true identities, did not impermissibly intrude upon defendants' confrontation rights); *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974) (affirming the district court's decision to allow the witness to withhold his address for safety concerns); *Rangel*, 534 F.2d at 148 (affirming the district court's decision to allow the witness to withhold his name, home address, and phone number for safety concerns). *United States v. Neuner*, No. 4:12-CR-050-A, 2014 WL 4493631, at *4 (N.D. Tex. Sept. 11, 2014) (permitting an FBI UCE to testify under a pseudonym in a gun case); *United States v. Calderon*, Case No 2:14-cr-103, Doc. 58 (C.D. Cal. April 23, 2015) (authorizing the withholding from defense of identifying information as to multiple undercovers).[2]

Moreover, the court may require that the defense show a "particularized need" or a showing of materiality to question the witness about the identifying information at issue—

---

[2] The government is not required to show a "specific threat to harm the witness" but only that threat rises above the level of hypothetical conjecture. *Martinez v. Brown*, 2009 U.S. Dist. LEXIS 58146, at *18-19 (S.D.N.Y. June 8, 2009). Courts have found an "actual threat" exists where the situation shows that the "possibility of foul play is obvious," or where the crime charged demonstrates a threat "inherent in the situation." *United States v. Cavallaro*, 553 F.2d 300, 304-05 (2d Cir. 1977); *McGrath*, 528 F.2d at 683-84. Moreover, "[t]he appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or from another source." *Celis*, 608 F.3d at 832; *accord United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1141 (10th Cir. 2014) (citing *Celis* with approval); *United States v. Ramos-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (same); *United States v. Doe*, 63 F.3d 121, 130 (2nd Cir. 1995).

such as why the defense would need the witness's current address or name. *Cavallaro*, 553 F.2d at 304-05; *see also United States v. El-Mezain*, 664 F.3d 467, 491-92 (5th Cir. 2011); *Caldwell*, 536 F.2d, 273-74; *United States v. Crockett*, 506 F.2d 759, 762-63 (5th Cir. 1975); *United States v. Penick*, 496 F.2d 1105, 1108-09 (7th Cir. 1974); *United States v. Smaldone*, 484 F.2d 311, 318-19 (10th Cir. 1973); *Alston*, 460 F.2d at 51-52; *United States v. Baker*, 419 F.2d 83, 87 (2nd Cir. 1969). Here, the defense cannot make any such showing because the OCE and UCE's true names and other identifying information are not relevant to their testimony or credibility.

In the instant case, the balancing of interests weighs heavily in favor of permitting the UC and OCE to testify under pseudonyms. Effective cross-examination is not hindered by the use of false names in this case; the defendants were never aware of the witnesses' true and complete names and learning them now would serve no constitutionally mandated purpose.[3] Moreover, disclosure of the witnesses' true names, or information revealing their true identities, would imperil the witnesses and their families and prevent them from effectively doing their jobs in the future. Further, in the instant matter, inquiry into personally identifying information of the witnesses is not necessary to vindicate the defendant's right to confrontation. This information is not relevant to the testimony of the witnesses and will not affect their credibility. Such an inquiry would be of little or no value in circumstances such as these, where the defendant and the witnesses interacted primarily through social media and when in person, the communications were recorded and have been provided to the defense. Finally, the government will continue to provide all material discoverable under *Brady v. Maryland*, impeachment material pursuant to *Giglio v. United States*, and Jencks Act statements.

Given the significant safety concerns attending disclosure of the witnesses' true names, the irrelevancy of the true identities to the testimony to be offered, the government's continued cooperation in turning over relevant material, and ample opportunity for

---

[3] Prior to trial, the government will submit a proposed list of names to be used by the parties during their questioning of the UCEs and OCEs.

effective cross-examination, the UC and OCE witnesses should be permitted to testify under pseudonyms and the defense should be precluded from asking the UCE and OCE questions that reveal personally identifiable information or could lead to the discovery of their true identities.

### B.   Light Disguise And Digital Obscuring of Video Evidence

Additionally, the government requests that the witnesses be permitted to testify in light disguise to further protect against the revelation of their true identities.   The government also requests that the Court permit the digital obscurity of the facial image of the UCE and OCE on any recorded video footage played during court proceedings.

Courts have held that a witness may testify in light disguise, particularly when there are security concerns, when the reliability of the evidence is otherwise assured, as they are here because the UCE and OCE will be physically present, their expression and demeanor visible to all, and they will be placed under oath. *See United States v. De Jesus-Casteneda*, 705 F.3d 1117, 1121 (9th Cir. 2013) (despite an informant's disguise in the form of a wig and mustache, his reliability was assured because "he was physically present," "testified under oath," "was subject to cross-examination," and "the jury was able to hear his voice, see his face including his eyes and facial reactions to questions, and observe his body language"); *United States v. Naseer*, No. 10 CR 19 (S-4) (RJD), 2015 WL 13843166, at *4 (E.D.N.Y. Jan. 26, 2015) (permitting members of MI-5 to testify in light disguise).

Like in *de Jesus-Casteneda*, the important interests in the instant case are readily apparent: the safety and continued effectiveness of the witnesses in their secretive professional capacity, as well as the safety of their families and associates. Moreover, the witnesses' physical appearance has no impact on the reliability of the evidence because each remains subject to the four foundational purpose elements of confrontation identified in *Maryland v. Craig* – "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." 497 U.S. at 836. And, the physical appearance of the witnesses is not at issue and has no bearing on the substance of the witnesses' interactions with the defendant. There is also no issue of physical identification of the witnesses for the

jury to consider and the light disguise will not be so extensive that the jury is unable to evaluate the demeanor of the witnesses while testifying.  Finally, for those witnesses who personally interacted with the defendants, many of those interactions were audio and video recorded and those recordings will be played for the jury.  However, it is essential to protect the safety of the witnesses that their unobscured faces not be broadcast to the public.  For these reasons, the government asks that the UC and OCE be allowed to testify in light disguise and to obscure the broadcasting of any images of the witnesses faces in order to provide necessary protection of their persons and undercover status.

## C. **Other Measures**

The remaining protective measures requested by the government—that the UCE and OCE be permitted to use non-public entrances and exits to the courthouse and courtroom, see *Alimehmeti*, 284 F. Supp. 3d at 495 (allowing UCs to use nonpublic entrances due to the "substantial risk that a testifying UC would be observed by members of the public, risking compromising the UC's ability to continue to serve in this role."); *United States v. Schulte*, 436 F. Supp. 3d 698, 707 (S.D.N.Y. 2020) (allowing CIA witnesses to use nonpublic entrances); *United States v. Bundy*, No. 2:16-CR-46-GMN-PAL, 2017 WL 888311, at *3, 8-9 (D. Nev. Mar. 6, 2017) (keeping in place the part of the protective order allowing a UCE to use nonpublic entrances); that all non-official recording and photographic devices be prohibited from the courtroom in which the UCE and OCE testify, as well as the courtroom in which any video or audio feed is shown during the UCE and OCE's testimony, *see United States v. Salemme*, No. 16-cr-10258-ADB, 2018 U.S. Dist. LEXIS 92738, at *8 (D. Mass. June 1, 2018) (prohibiting non-official recording devices to protect witnesses); *United States v. Hendricks*, No. 1:16CR265, 2018 U.S. Dist. LEXIS 32647, at *14 (N.D. Ohio Feb. 28, 2018) (issuing an order prohibiting the use of non-official recording devices in the courtroom where the UCE was to testify and in the room where the testimony would be broadcast); and that public disclosure of any audio  or video recording, or similar reproduction of the voice or visual image of the UC and OCE be prohibited, *see Hendricks*, 2018 U.S. Dist. LEXIS, *14—are all reasonable, necessary

1    measures that do not conflict with the defendant's right to confrontation, and ensure the
2    safety of the witnesses. Indeed, "[s]uch safety measures are commonplace in cases
3    involving UCs." *Alimehmeti*, 284 F. Supp. 3d 477, 495 (S.D.N.Y. 2018) (approving
4    permitting undercover employees to use nonpublic entrances and exits to the building and
5    the courtroom). Absent such procedures, there would be a substantial risk that members of
6    the public could observe the witness or otherwise compromise the witnesses' ability to
7    continue their critical work on behalf of the United States.

8           **D.    Prohibition on Eliciting Information about the FBI's Undercover**
9           **        Program**

10          The government seeks to protect information related to the undercover training
11   program, in particular, the techniques employed by the FBI to develop and maintain
12   undercover identities and bona fides.  Thus, the government requests that the defense be
13   prohibited from engaging in cross-examination designed to elicit information about the
14   FBI's Undercover Training Programs.  Public disclosure of techniques employed by FBI
15   undercover employees to develop and maintain undercover identities is unrelated to the
16   defendant's ability to mount an entrapment defense.

17          Because "[t]he government has a substantial interest in protecting sensitive sources
18   and methods of gathering information," *United States v. S*mith, 780 F.2d 1102, 1108 (4th
19   Cir. 1985), courts routinely grant protective orders restricting defendants' access to
20   sensitive information and investigative techniques, even when they are not classified. *See*
21   *Alimehmeti*, 284 F. Supp. 3d at 494-95 (permitting "general inquiry to the nature of the
22   work and objectives of a UC," but excluding "examination into the specifics of the [] UCs'
23   training and experience."); *United States v. Lindh*, 198 F. Supp. 2d 739, 742 (E.D.V.A.
24   2002) (Ellis, J.) (granting protective order prohibiting the public dissemination of
25   unclassified but sensitive material to prevent members of international terrorist
26   organizations from learning government investigative techniques from publicly available
27   sources); *see also United States v. Longueuil*, 567 F. App'x 13, 16 (2d Cir. 2014) (enforcing
28   protective order sealing documents containing sensitive information about the

government's investigative methods and techniques); *United States v. Van Horn*, 789 F.2d 1492, 1507-08 (11th Cir. 1986) (applying law enforcement privilege to block access to information concerning the location and nature of secret surveillance equipment); *United States v. Johnson*, 191 F. Supp. 3d 363, 370 (M.D. Pa. 2016) (granting government request for protective order covering sensitive investigative techniques because "files are rightly shielded from public access where they reveal specific details of surveillance techniques, including equipment used and location and timing of use, the revelation of which could compromise the agency's ability to conduct future investigations").

Accordingly, the government respectfully requests the Court employ its wide discretion to safeguard these critical training techniques for ongoing and future national security investigations. *See* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.").

## CONCLUSION

Each of these measures has been deemed reasonable and necessary to ensure the safety of witnesses and carefully balanced with Sixth Amendment rights by courts across the country. Without these procedures, there is a substantial risk in this case that members of the public could compromise the witnesses' safety and their ability to continue critical work on behalf of the United States. For the foregoing reasons, the United States respectfully requests that the Court grant this motion and adopt the propose.

Respectfully submitted this 25th day of June, 2021

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/ Beverly K. Anderson*

BEVERLY K. ANDERSON
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
Other means this 25th day of June, 2021 to:
Thomas Scott Hartzell, Esq.
Dan Cooper, Esq.