GARY M. RESTAINO
United States Attorney
District of Arizona
M. BRIDGET MINDER
Arizona State Bar No. 023356
CHRISTOPHER A. BROWN
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: Bridget.Minder@usdoj.gov
Email: Christopher.Brown7@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
U.S. Department of Justice
National Security Division
JOHN CELLA
Trial Attorney
Counterterrorism Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Telephone: 202-305-1601
Email: John.Cella@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Ahmed Mahad Mohamed and Abdi Yemani Hussein,<br>Defendants. | CR 19-02162-TUC-JGZ (EJM)<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS TO PRECLUDE TESTIMONY OF EXPERT LORENZO VIDINO** |

In July 2019, defendants Ahmed Mahad Mohamed ("Mohamed") and Abdi Yemani Hussein ("Hussein") were arrested while attempting to board a plane to Egypt in furtherance of their plan to fight as ISIS soldiers in the Sinai Peninsula. As the government's evidence at trial—including the records of defendants' own statements—will demonstrate, this was the culmination of defendants' self-radicalization in the violent

ideology associated with the global jihadist movement and terrorist groups including, but not limited to, ISIS. For at least months—and in Mohamed's case, years—defendants consumed and shared jihadist propaganda over the internet. They also discussed that propaganda with one another and with the FBI undercover personnel who will be government witnesses at trial, an Online Covert Employee ("OCE-2") and an Undercover Employee (the "UCE"). During these discussions, defendants frequently employed the terminology associated with jihadist ideology and terrorist groups to explain how and why they conspired and attempted to make "hijrah" (travel) to join "Dawlah" (the Islamic State or ISIS) and engage in violent jihad as ISIS "mujahideen," based on their desire to kill the "kuffar" (disbelievers) and become "shaheed" (martyrs).

At trial, the government must prove that defendants knowingly and intentionally conspired and attempted to provide themselves to work under ISIS's direction or control, and that they had knowledge that ISIS was a designated foreign terrorist organization ("FTO"), or that ISIS engaged in "terrorism" or "terrorist activity." To do so, the government intends to elicit testimony from Lorenzo Vidino, Ph.D., an international terrorism expert who can explain the meaning and significance of certain topics and terminology found in defendants' own statements, including the jihadist concepts and propaganda they consumed, shared, and discussed. (*See* Docs. 89, 217.) Courts regularly allow for such expert testimony and Dr. Vidino, himself, has been qualified by courts to testify on these and related topics in numerous other cases. *See infra* at 7.

Despite the clear relationship between Dr. Vidino's proffered testimony, defendants' own statements and conduct, and the elements that the government must prove at trial, both defendants have separately moved to preclude Dr. Vidino's expert testimony, arguing that it is irrelevant and unfairly prejudicial. (Docs. 344 (Hussein) and 367 (Mohamed).)[1] For the reasons discussed below, the Court should allow Dr. Vidino's proffered testimony and deny defendants' motions.

---

[1] At a status conference on February 2, 2024, both defendants agreed that a *Daubert* hearing is not necessary in relation to their objections to Dr. Vidino's proffered testimony.

## LEGAL STANDARD

### I. The *Daubert* Standard and Rule 702

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993), the Supreme Court established a "liberal standard of admissibility" for expert testimony. *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005). Federal Rule of Evidence 702, which incorporates the holding in *Daubert*, governs admissibility of expert testimony. Under Rule 702, a qualified witness may testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, a witness can qualify as an expert on the basis of "knowledge, skill, experience, training, or education." "The proponent of expert testimony need only lay a 'minimal foundation' of 'knowledge, skill, experience, training, or education' in the topic at hand" and "[y]ears of relevant experience can establish the necessary 'minimal foundation.'" *Longoria v. Kodiak Concepts LLC*, No. 18-CV-02334-PHX-DWL, 2021 WL 1100373, at *2 (D. Ariz. Mar. 23, 2021) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004)); *see also* Fed. R. Evid. 702, advisory committee notes on 2000 Amendments ("[T]he rejection of expert testimony is the exception rather than the rule.").

Rule 702 requires that expert testimony be both relevant and reliable. *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010). Relevancy simply requires that "the evidence logically advance a material aspect of the party's case." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Under the liberal admission standards of Rule 702, doubts about the usefulness of expert testimony are resolved in favor of admissibility and such testimony "should be tested by the adversary process with competing expert

testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

Reliability means that an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). While the trial court plays an important role in considering proffered expert testimony, a trial court is "a gatekeeper, not a fact finder." *Primiano*, 598 F.3d at 565. Accordingly, "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-a-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). In other words, "[c]hallenges that go to the weight of the evidence are within the province of the fact finder, not a trial judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

In *Daubert*, the Supreme Court stated that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kuhmo Tire*, 526 U.S. at 156; *see also* Fed. R. Evid 702, advisory committee notes on 2000 Amendments ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."). Consistent with *Daubert* and *Kuhmo Tire*, the Ninth Circuit has held that "in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is to be construed liberally." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Indeed, "[w]hen evaluating specialized or technical expert opinion testimony, 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (quoting *Kumho Tire*, 526 U.S. at 150). Where the expert testimony is based on "specialized knowledge" (as opposed to novel "scientific knowledge"), a trial court should focus on the proffered expert's personal experience and

methodology because "the *Daubert* factors are not intended to be exhaustive or unduly restrictive." *Id*. (*citing Sullivan v. U.S. Dept. of Navy*, 365 F.3d 827, 834 (9th Cir. 2004)). The enumerated *Daubert* factors "(peer review, publication, potential error rate, etc.) simply are not applicable to [non-scientific] testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter*, 373 F.3d at 1017 (internal quotation marks omitted) (expert testimony admissible despite no methodology because expert did not use one).

**II. Unfair Prejudice**

Relevant evidence, including expert testimony, may be excluded if its probative value is *substantially outweighed* by the danger of *unfair* prejudice. Fed. R. Evid. 403 (emphasis added). "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Yazzie*, 59 F.3d 807, 811-12 (9th Cir. 1995). But testimony that assists the jury in understanding the evidence—including evidence of defendants' statements about violent acts of terrorism and the terrorist propaganda they viewed and shared—is not prejudicial; it is probative. *See, e.g., United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (finding no error in admission of terrorism expert's testimony, since while "linking the appellants to extremist jihadist groups was undoubtedly prejudicial, it was not unfairly so. Indeed, the charges that were lodged against the appellants meant that the prosecution would necessarily seek to establish that link."); *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011), *as revised* (Dec. 27, 2011) ("Because this was a case about supporting terrorists, it is inescapable, we believe, that there would be some evidence about violence and terrorist activity.").

**ARGUMENT**

**I. Dr. Vidino's Proffered Testimony is Relevant and Helpful to the Jury**

Evidence concerning defendants' agreement, intent, motive, and knowledge in relation to ISIS and associated terrorist groups—including Dr. Vidino's proffered

testimony on these topics—is highly relevant to the charges in this case. Defendants are charged in the superseding indictment with conspiring and attempting to provide material support, namely, themselves as "personnel," to ISIS, in violation of 18 U.S.C. § 2339B. (Doc. 119.) For these charges, the government must prove that defendants knowingly agreed to provide (Count 1, conspiracy) and specifically intended to provide (Count 2, attempt) themselves "to work under [ISIS's] direction or control…" 18 U.S.C. § 2339B(h) ("Provision of Personnel"). The government must also prove that defendants knew ISIS was a designated foreign terrorist organization ("FTO"), or that ISIS engaged in "terrorist activity" or "terrorism." 18 U.S.C. § 2339B(a)(1).[2] In addition, Mohamed has noticed an entrapment offense, Doc. 212, so the government must prove either that Mohamed was predisposed to commit the crimes before being contacted by government agents or that he was not induced by government agents. *See United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016).

Thus, evidence regarding the defendants' familiarity with terrorist ideology, groups, significant figures, propaganda, and terminology—and its meaning—is relevant to the existence and scope of defendants' conspiratorial agreement, as well as their intent, motive, and knowledge in relation to the charged offenses. In the case of Mohamed, this evidence is also relevant to his predisposition. Moreover, information regarding the history of "terrorist activity" and "terrorism" perpetrated by ISIS, including how widely known such acts were in 2018-2019 at the time of defendants' charged conduct, is relevant to defendants' knowledge of ISIS as the charged FTO.

While the average layperson may have a surface familiarity with ISIS or certain terrorist attacks perpetrated by ISIS and associated groups, the jihadist ideology in which

---

[2] "Terrorist activity" is defined as "any activity that, if it had been committed in the United States or any State and that involves a threat, attempt or conspiracy to use any explosive, firearm, or other weapon or dangerous device…with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," and "terrorism" is defined as "premeditated politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 18 U.S.C. § 2339B(a)(1) (defining "terrorist activity" by reference to 8 U.S.C. § 1182(a)(3)(B) and "terrorism" by reference to 22 U.S.C. § 2656f(d)(2)).

defendants were steeped and which imbues their recorded communications is beyond the ken of the average juror. Dr. Vidino's twenty-plus years of experience and extensive knowledge in this field qualify him to provide helpful testimony regarding the ideological concepts and terminology defendants used to describe their terrorist aims, as well as the background and meaning of the terrorist propaganda defendants shared. *See* Ex. 1 (Vidino CV). He has provided expert testimony on these and related topics in thirteen other federal cases, including in the District of Arizona. *See id*. at 15-16;[3] *United States v. Kareem*, No. 15-CR-0707-SRB, Doc. 365 (D. Ariz. Mar. 9, 2016) (transcript); *United States v. Asainov*, No. 19-CR-402, Doc. 122 at 16 (E.D.N.Y. Jan. 13, 2023) (finding that "Dr. Vidino is qualified to testify about ISIS and its history, structure, and strategic goals, among other topics"); *United States v. Shafi*, No. 15-CR-00582-WHO-1, 2018 WL 3159769, at *3-4 (N.D. Cal. June 28, 2018) (finding that Dr. Vidino's expert testimony on ISIS and other terrorist groups is reliable, noting that his "terrorism expert testimony would rest upon experience and knowledge that the jury does not have.").

Here, Dr. Vidino's proffered testimony relates to the jihadist ideology both defendants discussed and said they adhered to, as well as the connection between that ideology and ISIS and associated terrorist groups. Indeed, as Mohamed acknowledges in his motion to preclude Dr. Vidino, "what Mr. Mohamed read, thought, and did" is "relevant and material at trial." (Doc. 367, at 4 (emphasis removed).) The same is true for Hussein. As described further below, Dr. Vidino's proffered testimony will be helpful to educate the jury regarding the network of jihadist groups and ideas that both defendants researched and

---

[3] *See, e.g., United States v. Al Farekh*, No. 15-CR-00268-BMC, Doc. 170 (E.D.N.Y. Oct. 2, 2017) (transcript); *United States v. Hendricks*, No. 16:CR-00265-JRA, Doc. 93 (N.D. Ohio Mar. 12, 2018) (transcript); *United States v. Alebbini*, No. 17-CR-71, Doc. 107 (S.D. Ohio Nov. 20, 2018) (transcript); *United States v. Ahmed*, No. 17-CR-00151-MAC-KFG, Doc. 185 (E.D. Tex. Mar. 13, 2020) (transcript); *United States v. Kandic*, No, 17-CR-00449, Doc. 351 (E.D.N.Y. May 11, 2022) (transcript).

In addition to the government's Rule 16 notices filed in this case, the government has produced to defendants hundreds of pages of Dr. Vidino's scholarship and transcripts of his prior testimony from these and other cases related to ISIS, its terminology, and associated topics, which provides additional information regarding Dr. Vidino's anticipated testimony in this case and the basis for his opinions.

discussed with one another, which bears directly on their knowledge, intent, motive, conspiratorial agreement, and, for Mohamed, predisposition, with respect the charged offenses. *See Asainov*, No. 19-CR-402, Doc. 122 at 17-18 (finding Dr. Vidino's expert testimony on ISIS to be "relevant" and "helpful," since "it provides the jury useful background on the terrorist group to which [defendant] is accused of providing material support…and it pertains to information outside the knowledge of an ordinary juror.").

Indeed, numerous other courts have concluded that similar expert testimony in terrorism cases such as this one is not only admissible, but essential. *See United States v. Hassan*, 742 F.3d 104, 130-32 (4th Cir. 2014) (given terminology and concepts likely unfamiliar to jurors, expert testimony necessary in terrorism case and not "unfairly" prejudicial); *United States v. Benkahla*, 530 F.3d 300, 309-10 (4th Cir. 2008) (lengthy expert testimony about various aspects of radical Islam "appropriate, and indeed necessary" in light of complicated evidence "touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam"); *see also United States v. Farhane*, 634 F.3d 127, 158-60 (2d Cir. 2011) (upholding admission of expert testimony regarding AQ's origins, history, structure, leadership, instructional methods, operational logistics, acts of terrorism, and radical Islamic ideology); *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (holding that "[e]xpert testimony is . . . appropriate in the context of a case – such as this one – which implicated the activities of terrorist organizations and their supporters."); *United States v. Kassir*, No. 04-CR-356(JFK), 2009 WL 910767, at *4–5 (S.D.N.Y. Apr. 2, 2009) (collecting cases where "courts have permitted expert testimony on the history, structure, leadership and methods of al Qaeda and other terrorist organizations.").

**A. Dr. Vidino's Proffered Testimony Is Relevant and Helpful to Explain Defendants' Statements Concerning Jihadist Ideology and ISIS, AQ, and al-Shabaab, as well as the Terrorist Attacks Those Groups Have Perpetrated and Promoted**

In his motion to preclude Dr. Vidino's testimony, Hussein incorrectly asserts that testimony "about specific terrorists and their horrific acts of terrorism are not relevant to

Mr. Hussein's conduct," that "[t]here is no evidence that Mr. Hussein embraced, practiced, or had an interest in Sharia law," and that "there is no evidence that has been disclosed…indicating that Mr. Hussein expressed any interest in or affiliation with AQ or its subsidiaries or with al-Shabaab…" (Doc. 344, at 2-3.) Likewise, Mohamed erroneously claims that AQ and al-Shabaab and the "terror activities" they have committed have "no connection to this case." (Doc. 367, at 4.) Mohamed also argues that testimony about "the history and origins of ISIS" and "the "acts of extreme violence committed by ISIS and other FTOs" are "unnecessary." (*Id*. at 7.) But defendants' contentions are belied by the voluminous record of defendants' own statements, in which they discussed their desire to engage in violent acts consistent with those carried out and promoted by ISIS and other terrorist groups, and in which defendants explicitly expressed their support for AQ, al-Shabaab, and sharia law in the months leading up to their attempted travel to ISIS-held territory. Dr. Vidino's proffered testimony will provide the helpful background and context necessary for the jury to evaluate that evidence.

For instance, in one of his first interactions with OCE-2 in August 2018, Mohamed stated that "if I come to Syria i want to be the beheading guy i will kill every kafir and murtad." Ex. 3. Mohamed reiterated the same desire (and predisposition) months later during his first interaction with the UCE: "…but wallahi In sha allah if I go to Syria I want to be the behading person wallahi this kuffar I want to kill them so many I am thirsty their blood [sic]." Ex. 4. Mohamed also repeatedly referenced "Jihadi John," an ISIS terrorist featured in propaganda videos beheading ISIS captives in Syria. *See* Ex. 5 ("I want to be the new jihadi John"); Ex. 27 at 000102-0046-47 (Jihadi John "pained the kuffar so much"). Hussein, too, repeatedly expressed his desire to engage in violence against ISIS's enemies, Ex. 28 at 000103-0115-16 ("Insha-allah, know what I want to be? I want to be, you know, where, um, where you kill people only. That's where I want to be…Kill, kill…"), and to emulate Jihadi John, specifically. *Id*. at 000103-0116-18 ("May Allah…accept his shahadah. That brother—he killed so—killed so many, kafer…That's what I want to be"). While the government does not intend to elicit testimony featuring

gratuitous details or descriptions of these or other terrorist attacks, Dr. Vidino's proffered testimony regarding the jihadist ideology to which defendants subscribed and that ideology's connection to the violence ISIS perpetrated and promoted will help explain both defendants' numerous statements about their desire to engage in similar acts of violence as ISIS fighters.

Dr. Vidino's proffered testimony will also be helpful to explain how defendants' discussion of attacks they desired to carry out in the United States reflects their knowledge of ISIS and the "terrorism" and "terrorist activity" in which ISIS has engaged. As Dr. Vidino will testify, defendants' statements regarding their would-be attacks echo details about attacks that have actually been perpetrated and encouraged by members of ISIS and the group from which ISIS arose, AQ. For instance, Mohamed described his idea of perpetrating a truck attack in New York, Ex. 6 ("Akhi when I get my passport I make hijrah or die or go in jail. If this kuffar stop me I will make attack with truck or anywhere that can kill so many kuffar"); Ex. 15 (describing how "easy" a truck attack would be, in order to "get shahada [martyrdom]"); Ex. 26 at 000101-0122 ("…so like just get gun and just get big truck and go to the New York and kill some- - some much people you can kill and fight the kuffar then you can die"), the type of attack promoted by ISIS in its propaganda and actually perpetrated by its supporters in the years prior to Mohamed's statements.[4]

Mohamed also stated that the Muslims in America needed a "wake up call," which would be for the "Islamic state to get victory or another 911." Ex. 7. And Hussein suggested attacking the White House with multiple planes in a conversation with Mohamed and the UCE, in a description that mirrored the September 11, 2001, attacks, and for reasons consistent with the antipathy toward democracy shared by AQ, ISIS, and other jihadist groups. Ex. 26 at 000101-0123, -0186-88 ("Like wanna do something? Just go to the White

---

[4] *See, e.g.*, "Judge Imposes Eight Consecutive Life Sentenced Plus 260 Years in Prison for ISIS-Inspired 2017 Murder of Eight Victims and Attempted Murder of 18 Others in NYC Truck Attack," U.S. Department of Justice Press Release (May 17, 2023), *available at* https://www.justice.gov/opa/pr/judge-imposes-eight-consecutive-life-sentences-plus-260-years-prison-isis-inspired-2017.

House," "If you want to make…like attack...That's the best…if you think about it…They make the laws…like um…you know….Like think about how many people like…How many people will die like…It's not even like one, you gotta do like several like you know just like two or like three…big planes."). The government does not intend to elicit detailed testimony from Dr. Vidino describing the September 11 attacks, but particularly in light of defendants' own statements, he should be permitted to provide testimony regarding these AQ attacks, which also feature in the jihadist propaganda associated with ISIS.

Dr. Vidino's proffered testimony will also be helpful to provide historical background that is relevant to defendants' discussions of the evolution of the jihadist movement, from AQ to ISIS, and their proclaimed support for AQ and its associated groups, to the extent those groups acted in alignment with ISIS. For example, during his online conversations with the UCE, Mohamed indicated that he selected an image of the al Qaeda in Iraq ("AQI") founder Abu Musab al-Zarqawi to be his new profile picture, and that he understood ISIS, which AQI adopted as its name in 2011, as an outgrowth of AQ. Ex. 11 ("abu musab al zarqaqi is the one who made Islamic state"); Ex. 19 ("Do you know Islamic state use to be part of Al Qaeda abu musab al Zarqawi May Allah accept him was their in Iraq [sic]"). Hussein similarly expressed his support for AQ, insofar as AQ's goals and methods matched those of ISIS. Ex. 26 at 000101-0146-48 (referencing AQ and al-Shabaab and suggesting, "why don't we just come together and then like fight together like as a like a…union like you know."). Mohamed and Hussein also indicated that they watched and listened to hours of lectures by Anwar al-Awlaki, a propagandist and leader of al Qaeda in the Arabian Peninsula ("AQAP") who was killed prior to AQI's adoption of the ISIS name and AQ's split with ISIS. *See infra* at 16. The jury is unlikely to be familiar with these and other jihadist figures referenced by defendants, such as former ISIS spokesperson, Abu Mohammad al-Adnani, *see, e.g.*, Ex. 24 at 003413-0024, and the former ISIS leader, Abu Bakr al-Baghdadi, *see, e.g.*, Ex. 20, nor will those figures' connection to defendants' desire to join ISIS abroad in 2019 be evident to the layperson without the aid of Dr. Vidino's proffered testimony.

In addition, contrary to defendants' assertions in their motions to preclude Dr. Vidino's testimony, both Mohamed and Hussein specifically discussed their support for al-Shabaab, an AQ-aligned terrorist group operating in Somalia, where both defendants were born and have family. In the months prior to defendants' arrest, Mohamed told the UCE, "Every day I listen radio in al furqan Al-Shabaab radio…" Ex. 12. Mohamed also told Hussein and the UCE that he condoned the killing of his own family in Somalia by the "mujahidin al-Shabaab" if his family members fought for the Somali government's U.S.-backed "army of the kufr [disbelievers]." Ex. 26 at 000101-0087-88; *see also id*. at 000101-0055-56. During one of the same conversations with Mohamed, approximately a month before their arrest, Hussein stated, "I support Al-Shabaab," Ex. 26 at 000101-0054, but then explained, "Al-Shabaab, they are not real Dawlah [Islamic State]…You know why? Because I don't know, the way they they are not doing the right way, the way Islamic State does, they are not doing that you know….they, I love them you know, they are fighting you know they doing like really good stuff, you know, I love them, but I just feel like they are not doing the right way…What the Islamic State is doing." Ex. 28 at 000103-0251. As indicated in the government's notice, Dr. Vidino's proffered testimony concerning the "fluidity of support for various organizations within the global jihadist ideology," including between AQ, al-Shabaab, and ISIS, Doc. 217 at 5, will aid the jury in understanding defendants' mixed statements concerning AQ and al-Shabaab, including why such statements are consistent with their motive and intent to fight abroad for ISIS.

Hussein also argues that Dr. Vidino should not be permitted to testify regarding sharia law or ISIS's view of Shia Muslims because "[t]here is no evidence that Mr. Hussein embraced, practiced, or had an interest in Shariah law," and that this case "has nothing to do with Shariah law or the distinctions between Sunni and Shia Muslims." (Doc. 344, at 3 and 5.) Again, this overlooks Hussein's (and Mohamed's)[5] own statements about these

[5] While the government does not concede that this is an appropriate area of expert testimony for Mohamed's noticed mental health expert, Dr. Stevan Weine, Dr. Weine has indicated that he intends to testify that Mohamed was "motivated not by wanting to join

topics. Dr. Vidino's testimony regarding the jihadist ideology associated with ISIS and these other groups, including their support for sharia law, will be helpful for the jurors as they evaluate those statements. *See, e.g.*, Ex. 28 at 000103-0136 (Hussein recounting a discussion with his mother in which he said, "I want to live in shari'ah"); Ex. 23 (Mohamed stating that he told Hussein that he, Mohamed, wants to join ISIS "because dawla [ISIS] are on truth I also want to live sharia the law of Allah….I also want to be shahid martyr."); Ex. 26 at 000101-0112-114 (Mohamed and Hussein discussing why Shia are not true Muslims, with Hussein saying that they "are worse than the Christian and…the Jews, like way worse," and Mohamed stating approvingly that "dawlah" (ISIS) "kill so many"). Dr. Vidino will provide helpful context for the jury as it considers these statements by defendants about their intent and motive.

Both defendants rely on *Vallejo*, 237 F.3d 1008, to argue that Dr. Vidino's proffered testimony regarding the global jihadist movement and terrorist organizations is irrelevant to the terrorism conspiracy and attempt charges here, *see* Doc. 344 at 5-6; Doc. 367, at 8, but this argument stretches *Vallejo* too far. *Vallejo* involved a customs agent whom the district court permitted to provide expert testimony regarding the "structure of drug trafficking organizations" in the case of a defendant charged with narcotics trafficking offenses, but no conspiracy, after the defendant was stopped with a large amount of marijuana at the U.S.-Mexico border. 237 F.3d at 1012-13. Unlike here, there was no direct evidence showing that the defendant in *Vallejo* sought to associate himself with the type of international criminal organizations featured in the customs agent's testimony, and the Ninth Circuit found it fatal that neither the government nor the district court had ever articulated the relevancy of the agent's expert testimony to the specific charges in that case. *Id.* at 1016. But as described herein, Dr. Vidino's proffered testimony explaining how ISIS and associated terrorist groups fit into the global jihadist movement—of which defendants

ISIS and engage in terrorist attacks but by wanting to live in a country under Sharia law and to extract himself from his current situation." Weine Affidavit, Exhibit 1 to Doc. 342 (filed under seal). If this testimony from Dr. Weine is allowed, Dr. Vidino's proffered testimony regarding sharia law in the context of ISIS ideology will have even greater relevance.

saw themselves as part—is relevant to multiple issues of fact in this case, including the existence and scope of defendants' charged conspiracy, and defendants' intent, motive, and knowledge in relation to their attempt to put themselves under the direction or control of ISIS, not to mention Mohamed's predisposition as to these offenses.

The Ninth Circuit also held in *Vallejo* that if the government had relied on the agent's testimony concerning the structure and *modus operandi* of drug trafficking organizations to prove the defendant's knowledge, such testimony was inadmissible under Rule 403 given that he was "not alleged to be associated with a drug trafficking organization in even the most minor way." *Id.* at 1017. But here, the charges directly involve defendants' attempted support for ISIS, and defendants' statements provide ample basis for Dr. Vidino to testify regarding the history and background of the groups to which defendants, themselves, sought to join and fight for overseas. Dr. Vidino's testimony is highly probative given its close connection to the evidence of defendants' conduct and not outweighed by any danger of unfair prejudice, as described further below. *See infra* at 18-20.

**B. Dr. Vidino's Testimony Regarding Terrorist Propaganda and the Call by ISIS to Travel Overseas is Relevant and Helpful to Explain Defendants' Self-Professed Radicalization and Their Intent to Travel to ISIS Territory**

As the government's notice makes clear, Dr. Vidino will not seek to "profile" either defendant as an ISIS supporter, Doc. 216, at 4, but his proffered testimony regarding the jihadist propaganda that Mohamed and Hussein consumed and discussed will help the jury connect the ideas and figures in that propaganda with defendants' self-radicalization, in relation to their intent and predisposition to travel and fight for ISIS overseas. In particular, Dr. Vidino will provide helpful testimony identifying the specific ISIS propaganda materials that appears in defendants' online communications or that they otherwise reference, including the "Rumiyah," "Dabiq," and "From Dabiq to Rome" ISIS magazines read and shared by Mohamed, as well as the propaganda videos from ISIS's "Al-Hayat Media Center" that Mohamed and Hussein viewed and shared. *See, e.g.*, Ex. 8 (Mohamed stating he "love[s] magazine abu rumiyah" and sharing covers of Rumiyah and Dabiq

magazines; also stating that "I used to read this magazine rumiyah everyday" and "I think I watch every Islamic state videos on al hayat media center"); Ex. 29 at 000104-0014 (on the drive to the airport before his arrest, Mohamed stating to Hussein and the UCE, "Rumiya[h] magazine, it says don't take [sic] eye contact with the airport. When you get there just go straight…"). Dr. Vidino will also provide helpful background testimony concerning the availability of ISIS propaganda videos and "nasheed" songs online, which Mohamed said convinced him to support ISIS and its jihadist worldview in 2016. *See, e.g.*, Ex. 13 ("2016 is when Allah guide me…I search isis then I click dawla nasheed and that nasheed I loved i never hear something beautiful like that…Then subhanallah I went on google I search where I can watch isis video where do isis post videos. Then I used to watch every video…"). The evidence reflects that Hussein was also was radicalized by viewing online ISIS propaganda videos and nasheeds. *See, e.g.*, Ex. 27 at 000102-0042-43 (Mohamed describing how Hussein accepted ISIS after watching Al-Hayat Media Center videos: "I was just telling him, you know, like Insha-Allah, just this path is the only true path, man…I show him, even, you know, al-Hayat made in jihad…I told him, watch so many videos, you know…So, he watch, he watch, so like, the next two month, he come to me and he was saying, 'man, you're right, bro, and the Islamic State is on the right path…"); Ex. 28 at 000103-0173-186 (Mohamed and Hussein discussing how Hussein decided to travel to join ISIS after discussing with Mohamed and viewing ISIS videos online).

Dr. Vidino's proffered testimony will be helpful to the jury to understand the content of the videos and nasheeds that defendants said they watched and "loved," including how those materials encouraged ISIS supporters to travel to ISIS-held territory abroad to fight on behalf of ISIS, as charged here. Mohamed argues that Dr. Vidino cannot "properly opine about the purported impact of articles in Islamist publications 'such as *Dabiq* and *Rumiyah*'…without first showing that Mohamed read those articles." (Doc. 367 at 5.) But as described above, the government's evidence will include such a showing. Thus, Dr. Vidino's testimony will aid the layperson not familiar with ISIS's media production arms

or the availability of ISIS propaganda online, and Dr. Vidino will be able to describe the meaning and significance of the ISIS propaganda defendants specifically acknowledged consuming when they agreed to support ISIS.[6]

Dr. Vidino should also be permitted to offer helpful testimony regarding Anwar al-Awlaki, a prominent English-speaking jihadist propagandist and AQAP leader, whose lectures both defendants repeatedly listened to and discussed. *See* Ex. 10 (Mohamed indicating that he listened to al-Awlaki's lectures); Ex. 14 (same); Ex. 18 (Mohamed: "I was watching all day anwar al awlaki his videos subhanallah I was just crying"); Ex. 21 (Mohamed: "Me and the brother [Hussein] listening anwar al awlaki"); Ex. 22 (Hussein sending YouTube video featuring al-Awlaqi to the UCE); Ex. 28 at 000103-0027-28 (Mohamed and Hussein discussing watching the "Anwar al-Awlaki channel" with videos online). Dr. Vidino's proffered testimony identifying al-Awlaki and explaining his role as an advocate for violence against the West, will help the jury understand defendants' references and statements as the jury evaluates this evidence of their intent. *See United States v. Kabir*, No. ED CR 12-00092-B-VAP, 2015 WL 631961, at *4 (C.D. Cal. Feb. 13, 2015) (defendant's familiarity with al-Awlaki relevant to defendant's intent in relation to Section 2339A charge); *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014) (same in relation to Section 2339B charge). Among other things, Dr. Vidino will explain how al-Awlaki, consistent with the other ISIS propaganda defendants discussed, encouraged jihadists to travel overseas, just as defendants conspired and attempted to do here.

---

[6] While Hussein argues that Dr. Vidino's proffered testimony concerning "radicalization" is "neither probative of any fact at issue nor relevant to Mr. Hussein," Doc. 344 at 4, he has separately provided notice of his own proffered expert to describe how ISIS relied on the internet to "enhance[e] the prospect for self-radicalization" among its followers, and to spread propaganda online that encouraged a "hijrah" migration to ISIS-held territory. (Doc. 382, at 2-3.) Hussein's expert notice also includes a number of other topics that are improper topics of expert testimony under Rule 702, to which the government will respond separately.

### C. Dr. Vidino's Testimony Regarding Jihadist Terms and Symbols Will Assist the Jury in Understanding Defendants' Statements

Defendants also object to Dr. Vidino's proffered testimony concerning the meaning and significance of terms and symbols that appear in the defendants' online communications and referenced during their recorded conversations with each other and the UCE, arguing that the meaning and significance of those terms are "irrelevant" and "unfounded." *See* Doc. 344, at 3; Doc. 367, at 5. But the relevancy of such testimony is clear in relation to the records of defendants' communications. While neither defendant spoke Arabic, their communications are riddled with Arabic terms that have a particular use in the context of the defendants' support for jihadist ideology and ISIS, in particular. *See, e.g.*, Ex. 2 ("…am living in usa am islamic state supporter soon I want to make *hijrah*…"); Ex. 27 at 000102-0029 ("When I go to *Dawlah*, I'm going…I'm going to be the best *mujah[i]d* I can, you know?"); Ex. 6 ("…when I get my passport I make *hijrah* or die or go in jail. If this *kuffar* stop me I will make attack with truck or anywhere that can kill so many *kuffar*."); Ex. 9 ("…my only dream is to be *shahid* fight for the [sake] of Allah *jihad* fisabililah") (emphasis added). In addition to these and other terms, defendants discussed and shared propaganda videos and materials that contain imagery and symbols that Dr. Vidino will identify as associated with ISIS, specifically, including the ISIS flag, a single raised finger, and lions. A sample of the many examples of where Dr. Vidino's expertise will be helpful—two screenshots from a pro-ISIS propaganda video that Mohamed, himself, created—are included below:





*Video produced at* 003310-0002 (screenshots at 0:47 and 0:54). The meaning of these terms and symbols in the context of jihadist ideology and the ISIS propaganda discussed by defendants is not merely Dr. Vidino's "personal opinion," Doc. 367, at 5, but is the product of his years of experience in this milieu, including his review and study of ISIS and other jihadist propaganda.

Rule 702 permits an expert such as Dr. Vidino to provide expert testimony on the meaning of these terms and symbols, including with reference to their contextual relationship to terrorism and their use by supporters of jihadist groups like ISIS. "Opinions on the meaning of so-called 'coded words' are…'well established as an appropriate subject for expert testimony.'" *United States v. Garcia*, No. 18-CR-00466-BLF, 2021 WL 4691310, at *10 (N.D. Cal. Oct. 7, 2021), *citing United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014). Given that the defendants used such ideologically infused terms to describe their aims and knowledge about ISIS, Dr. Vidino should be afforded the ability to provide background and context for those terms, including how they have been used in relation to violent jihad. Many of these terms are not only in a foreign language, but also relate to ideological concepts that will not be familiar to the jury, so Dr. Vidino's testimony will be particularly helpful and indeed, necessary. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

## II. The Probative Value of Dr. Vidino's Proffered Testimony is Not Substantially Outweighed by the Danger of Unfair Prejudice

Dr. Vidino's proffered testimony is tethered to statements that defendants, themselves, made and propaganda that defendants, themselves, shared in connection with the charged conspiracy and attempt to fight for ISIS. Many of their statements include defendants' own calls to violence in graphic terms, *see, e.g.*, Ex. 3 (Mohamed: "i want to be the beheading guy"); Ex. 28 at 000103-0259 (Hussein: "I just want to make Egypt so much, like so much blood man…So much blood"); Ex. 25 (Mohamed: "Akhi abu jihad [Hussein] he's very serious he really wanna kill the kuffar. He wants to swim the blood of the kuffar"). Thus,

there is no danger that Dr. Vidino's explanatory testimony will unfairly "inflame" or "confuse" the jury as defendants argue. *See* Doc. 367, at 7; Doc. 344, at 4-5 and 7. To the extent that Dr. Vidino's proffered testimony on jihadist ideology and terrorist groups relates to topics that are "emotionally charged," those topics are "directly related to the nature of the crimes that the defendant[s] ha[ve] set out to commit." *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013) (affirming district court's admission of terrorism evidence over Rule 403 objection).

As described above, the records of Hussein's communications indicate that he discussed the same jihadist concepts, expressed the same support for jihadist terrorist organizations, and consumed much of the same ISIS propaganda as Mohamed. But to the extent that Hussein's motion to preclude Dr. Vidino's testimony is based on an argument that his testimony is "disconnected from the actions of Mr. Hussein" because it relates to statements made by Mohamed outside of Hussein's presence, *see* Doc. 344, at 9, it is unavailing. Mohamed's statements regarding the jihadist propaganda he viewed and his support for ISIS are admissible against Hussein as statements made by Hussein's co-conspirator, Mohamed, during the course of and in furtherance of their conspiracy to provide material support to ISIS. *See* Fed. R. Evid. 801(d)(2)(E). And Mohamed's statements are probative of the existence and scope of the conspiracy with which Hussein is charged. Thus, Dr. Vidino's proffered testimony "fits" (*i.e.*, "logically advances a material aspect of") the government's case against Hussein, *Daubert*, 509 U.S. at 591, and presents no risk of unfair prejudice. For example, despite Hussein's argument to the contrary, Doc. 344, at 4, Dr. Vidino's proffered background testimony about the March 2019 Christchurch, New Zealand mosque shootings—videos of which Mohamed sent to the UCE and said motivated him to "make hijrah," Ex. 16, and "make revenge," Ex. 17—is admissible, without limitation, as to both defendants because it relates to the existence and scope of the charged conspiracy. *See United States v. Holmes*, 751 F.3d 846, 851 (8th Cir. 2014) (admitting evidence of "narco-saint" iconography found in home of one

conspirator against co-conspirator defendant without limiting instruction because it was "relevant to establish the existence of the conspiracy").

With respect to both defendants, Rule 403 is not a bar to expert testimony related to the connection between their own statements and ISIS. It is defendants' conduct that has forced the issues of terrorism and terrorist ideology into the center of this case. *See United States v. Felton*, 417 F.3d 97, 103 (1st Cir. 2005) (while "highly pejorative," the government's use of the term "terrorist" to describe co-conspirator defendants and their actions was appropriate because it was a "function of the acts defendants engaged in, not the government's inaccurate description of those acts."). Simply put, defendants' actions require the type of helpful testimony that Dr. Vidino will provide.

**CONCLUSION**

For the reasons set forth above, Dr. Vidino's proffered expert testimony is relevant and "fits" with the case against both defendants. Given its connection to other admissible evidence of the defendants' own statements and conduct, it presents no danger of unfair prejudice. Thus, the Court should allow Dr. Vidino's proffered expert testimony and deny defendants' motions.

Respectfully submitted this 27th day of February, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/John Cella*
JOHN CELLA
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice

Copy of the foregoing served electronically or by other means this 27th day of February, 2024, to:

All ECF recipients