GARY M. RESTAINO
United States Attorney
District of Arizona
M. BRIDGET MINDER
Arizona State Bar No. 023356
CHRISTOPHER A. BROWN
LIZA M. GRANOFF
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: Bridget.Minder@usdoj.gov
Email: Christopher.Brown7@usdoj.gov
Email: Liza.Granoff@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
U.S. Department of Justice
National Security Division
JOHN CELLA
Trial Attorney
Counterterrorism Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Telephone: 202-305-1601
Email: John.Cella@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 19-02162-TUC-JGZ (EJM) |
| Plaintiff, | |
| vs. | **UNITED STATES' SENTENCING MEMORANDUM** |
| Ahmed Mahad Mohamed and Abdi Yemani Hussein, | |
| Defendants. | |

For many months in 2018 and 2019, Mohamed and later Hussein talked online and in person about traveling to the Middle East to join ISIS, commit violent and deadly acts including beheadings, and die as martyrs engaging in jihad. In July 2019, defendants put their words into action. Defendants were arrested at the airport on their way to Egypt, where they intended to smuggle themselves into ISIS-controlled territory and carry out their plans.

The United States urges the Court to accept defendants' plea agreements and impose the maximum sentences under their terms: 16 years of imprisonment for Mohamed and 11 years of imprisonment for Hussein, to be followed by their removal from the United States. These sentences appropriately balance the seriousness of defendants' offense with their histories and characteristics, account for their different roles in the offense, address public policy considerations, and avoid unwarranted sentencing disparities.

**The Guidelines Range and PSRs**

Consistent with their plea agreements, the draft Presentence Investigation Reports (PSRs) correctly calculate an offense level of 37 and a criminal history category of VI, which corresponds to a sentencing guidelines range of 360 months to life. *See* Hussein PSR ¶¶ 32-47 (Doc. 553); Mohamed PSR ¶¶ 31-46 (Doc. 555). Because the statutory maximum sentence for a violation of 18 U.S.C. §§ 2339B is 20 years, however, the guideline term of imprisonment is 240 months. *See* Hussein PSR ¶¶ 69-70; Mohamed PSR ¶¶ 64-65. The government agrees with the PSRs' guidelines calculation.

The PSR recommends a below-guidelines sentence for both defendants – 230 months for Mohamed and 200 months for Hussein – but one that is above the stipulated maximum prison sentence for each defendant, contrary to the terms of the plea agreements *See* Mohamed PSR at 18; Hussein PSR at 19; Doc. 537 at ¶ 7.a (Mohamed plea agreement); Doc. 542 at ¶ 7.a (Hussein plea agreement).

**The § 3553(a) Factors**

Although the PSRs' recommendations are reasonable, the government believes the maximum sentences allowed under the plea agreements – 192 months (16 years) for Mohamed and 132 months (11 years) for Hussein – coupled with removal from the United States and a lifetime term of supervised release, are sufficient but not greater than necessary to comply with the § 3553(a) factors, as discussed below. The stipulated sentencing caps reflect significant downward variances from the stipulated guidelines range and further variances are not warranted. Nor are any downward departures warranted and defendants are not allowed to seek them under the terms of the plea agreements.

I.      **The nature and circumstances of the offense**

The gravity of defendants' offense cannot be overstated: defendants planned to fight, kill, and even die for ISIS, a notorious foreign terrorist organization that has conducted and inspired deadly attacks against U.S. and Western interests around the world for 20 years. That law enforcement discovered their plans, covertly uncovered their conspiracy, and stopped them from traveling does not lessen the severity of their crime.

The nature and circumstances of defendants' offense is summarized in the factual bases of their plea agreements and PSRs and will not be repeated here. *See* Docs. 537, 542 (plea agreements); 553, 555 (PSRs). It is important to keep in mind, however, that these summaries discuss only a small sample of defendants' many messages and conversations, which occurred almost daily over the course of nearly a year for Mohamed and intermittently but increasingly over a span of almost five months for Hussein. During this time, defendants (especially Mohamed) consistently professed their support for ISIS and its leaders. They repeatedly said they loved jihad and were serious about making hijrah (migration to join and fight for ISIS abroad). They consumed ISIS propaganda, watched and shared numerous videos showing graphic acts of violence by ISIS fighters, and talked on multiple occasions about the violent acts they wanted to commit when they joined ISIS. Over and over, defendants framed their options as binary – hijrah or jail – and glorified martyrdom, their ultimate goal. These themes are repeated in hundreds of online messages and hours of in-person meetings.

It wasn't just talk. For several months, defendants took action toward achieving their goal. They applied for travel documents so they could travel internationally. They saved money. They joined a gym and worked out. They sold their cars. They bought plane tickets, new backpacks, and clothes for their trip to Egypt. They put together $10,002 in cash to bring with them. They rode to the airport, checked in for their flight, went through security, and were about to get on the plane. If law enforcement had not stopped them, they planned to fly to Egypt, smuggle themselves into ISIS-controlled territory, and ultimately join and fight for ISIS.

In short, this was not a whim. Defendants' offense was long-running. It was planned. And it was grounded in a deep-seated embrace of radical ideology.

Defendants' arguments to the contrary are not persuasive and do not lessen the severity of their offense.[1] First, any suggestion that defendants were not actually radicalized or serious about making hijrah is belied by their own words and actions. So is their suggestion that government agents convinced them to make hijrah. Mohamed said before and after his arrest that he started supporting ISIS in 2015 or earlier. *See* PSR ¶¶ 20, 26.[2] Before Mohamed started messaging with law enforcement, he was engaging with other ISIS supporters online, posting tributes to ISIS leaders, saying he wanted to be the next Jihadi John (an infamous ISIS terrorist featured in propaganda videos beheading ISIS captives), and sharing graphic videos.[3] *See* PSRs ¶¶ 11, 27; Doc. 450-2 (chart listing Mohamed's social media posts). A video Mohamed posted weeks before he first contacted an FBI online covert employee (OCE) shows multiple beheadings. *See* Docs. 450, 450-2 at 6 (discussing Trial Exs. 551/552). When Mohamed posted the gory video, he said: "I love watching videos like this," followed by a knife emoji:

///
///
///
///
///

---

[1] These and other arguments are raised in Hussein's sentencing memorandum (Doc. 575) and the reports Mohamed disclosed on December 20, 2024 (see Doc. 568). If Mohamed makes additional arguments in a yet-to-be filed sentencing memorandum, the government may file a written response, address them orally at sentencing on January 10, 2025, or both.

[2] The offense conduct in both PSRs is the same. Therefore, when citing to particular paragraphs of the offense conduct, the government will simply cite to the "PSR." When citing to other portions of the PSRs that differ, such as the offender characteristics, the government will specify the PSR (Hussein's or Mohamed's) to which it is citing.

[3] It is possible, even likely, Mohamed's pro-ISIS social media posts started well before June 2018 and that his prior accounts were shut down before he began engaging with undercover employees online. The government is relying on content it obtained from accounts that were active when Mohamed was engaging with the OCEs and UCE.

> **moqdad1998**:
>
> 👍👍 الله اكبر. هذه ما وعدنا به الروافض والنصيرية. واليهود والنصارى. توبو وارجعو الى الله قبل ان نقدر عليكم. فأن لم تفعلو ابشرو بما يسوئكم 🗡
>
> I love watching videos like this 🗡
>
> July 23rd, 2018 1:51am

This deeply disturbing video and other examples show Mohamed was radicalized well before he started engaging with the OCEs in August 2018. He was also determined to make hijrah and join ISIS. Mohamed told OCE-1 and OCE-2 as much when he first messaged them in August 2018. *See* PSR ¶¶ 6-7.[4] And the first time Mohamed contacted the FBI's undercover employee (UCE) on December 3, 2018, he talked about killing and beheading, among other things, and asked for the UCE's help to make hijrah. *See* PSR ¶ 10.[5]

When Hussein began to support ISIS is less clear. In August 2018, Mohamed told OCE-2 that he had a friend in Arizona who wanted to make hijrah but did not specifically name Hussein.[6] In any event, it was Mohamed, not the UCE, who convinced Hussein to support ISIS and make hijrah. *See* PSR ¶¶ 16-17, 20. The government believes the five-year difference between their stipulated sentencing caps appropriately accounts for their different roles in the conspiracy, among other considerations. *Compare* Doc. 537 ¶ 7.a with

---

[4] *See also* Trial Ex. 40 at 0040-0003 (8/9/18 messages between Mohamed and OCE-1); Trial Ex. 3 at 0003-0003, -0012 (8/13/18 messages between Mohamed and OCE-2) (copies of both exhibits provided to the Court on Dec. 30, 2024).

[5] *See also* Trial Ex. 51 at 0051-0018, -0026 (12/3/18 messages between Mohamed and UCE) (copy of exhibit provided to the Court on Dec. 30, 2024).

[6] *See* Trial Ex. 3 at 0003-0025 (Mohamed: "… one brother here same state he also want to make hijrah….").

- 5 -

Doc. 542 ¶ 7.a (plea agreements). Once Hussein had committed to the conspiracy with Mohamed to fight for ISIS abroad, he was similarly determined. *See*, *e.g.*, PSR ¶ 9 (Hussein: "I just want to make Egypt so much, like so much blood, man…So much blood") and ¶ 22 (Mohamed: Hussein is "very serious he really wanna kill the kuffar [unbelievers]. He wants to swim the blood of the kuffar"). The first time Hussein met the UCE, in March 2019, he professed his commitment to making hijrah, saying: "We make it (referring to hijrah), or we go to jail." PSR ¶ 14. In June 2019, Hussein talked enthusiastically about making hijrah, joining ISIS, and wanting to "be on the front line" and "be killer" in Egypt. PSR ¶ 19. These and numerous other statements show defendants were serious about making hijrah and joining ISIS without being influenced by the OCEs and UCE.

Second, defendants' claim that it was illogical or impossible for them to join ISIS in the Sinai Peninsula is also unpersuasive and, in any event, does not detract from the seriousness of their offense. Criminal offenses, particularly the offense of providing material support in the form of oneself to a foreign terrorist organization like ISIS, are not always logical or easily accomplished. And as this Court held a few months ago, "factual impossibility is not a valid defense…." Doc. 535 (precluding Dr. Chalk from testifying that defendants' plan to join and fight for ISIS was factually impossible).[7]

Defendants seem to suggest that if they were really serious about joining ISIS, they would have gone somewhere else – somewhere easier to get to, somewhere more welcoming to foreign terrorist fighters. But defendants' commitment to going somewhere hard actually shows just how serious they were about their goal to join ISIS. And whether it would have been hard for defendants to get into ISIS-controlled territory in the Sinai ignores the bigger picture. Defendants were intent on making hijrah and joining ISIS. No

---

[7] Nor is factual impossibility a valid basis for a downward departure, contrary to Hussein's suggestion. *See* Doc. 575 at 27, n. 10 ("Impossibility is, however, relevant to … the departure provision of U.S.S.G. § 2M5.3."). Defendants stipulated in the plea agreements that that they would not seek any downward departures. *See* Docs. 537 ¶ 7.b, Doc. 542 ¶ 7.b (plea agreements). Moreover, the text of § 2M5.3's departure provision makes clear that a downward departure under § 2M5.3 is not appropriate in this case because the listed factors are not "present in an extreme form." U.S.S.G. § 2M5.3, application note 2.

matter where they tried to go, it would have been hard – maybe even harder (like Syria). And it was supposed to be hard. Jihad, literally translated, means a struggle, and for these defendants, it also meant holy war. *See* PSR ¶ 7. Defendants weren't looking for an easy trip. They were jihadists, not tourists.

It is not surprising, however, that defendants wanted to make hijrah to the Sinai. ISIS's Sinai branch famously downed a commercial airliner in October 2015, killing 224 civilians onboard. *See* McManus Report at 5. And ISIS was very active in the Sinai in 2018 and 2019, conducting "near weekly" assaults and several high-profile attacks that killed dozens of people, when defendants were talking about making hijrah.[8] Moreover, as Mohamed's new expert admits, ISIS fighters in the Sinai were featured in ISIS propaganda videos published when they were planning their trip. *See* McManus Report at 11 (discussing ISIS videos published in September 2018 and April 2019). Law enforcement didn't have to convince or coerce defendants into choosing Egypt and the Sinai as a destination. Although OCE-1 mentioned Sinai to Mohamed the first time they exchanged messages, it was in the context of telling Mohamed he had no chance of getting into Syria, not to convince Mohamed that he should go to the Sinai.[9] And it was Mohamed who first suggested to the UCE that they go to the Sinai.[10]

---

[8] *See, e.g.*, United States State Department's Country Report on Terrorism, *available at* https://www.state.gov/reports/country-reports-on-terrorism-2019/#ISIS-SP. The State Department's 2019 Report says, among other things, that "ISIS continued its terrorist campaign in the Sinai" in 2019 and "remains intent on expanding its influence and operations in the Sinai." The report also states that in 2019, "428 significant conflict events occurred in Northern Sinai, including 134 IED-related attacks, 153 airstrikes, and near weekly complex assaults on government fortified positions by ISIS-SP," as well as several high-profile attacks in 2019, including four on Egyptian military bases and police/army checkpoints that killed more than 50 people; an attack on a bus of religious pilgrims which killed seven and wounded 14; the beheading of four civilians; and a suicide bombing that killed two.

[9] *See* Trial Ex. 40 at 0040-0003 (OCE-1: "hijrah to Sham?? akhi, not sham" Mohamed: "Yes sham Syria" OCE-1 "sinai or libya maybe, but sham, forget it" Mohamed: "Why akhi" OCE-1 "there are no open routes.only smugglers and it cost too much money").

[10] *See* Trial Ex. 51 at 0051-0028 (UCE: "Hijrah to where?" Mohamed: "Syria or sinia egpty [sic]").

Perhaps the biggest flaw with defendants' argument about their allegedly illogical or impossible plan to go to the Sinai is that it ignores defendants could have – and likely would have – tried to travel elsewhere if they didn't go to the Sinai. Defendants weren't saying 'Sinai or jail,' defendants were saying 'hijrah or jail.' *See* PSR ¶ 14. Defendants were committed to making hijrah to fight for ISIS – somewhere, anywhere – and if they couldn't make hijrah they talked about doing something in the United States. *See* PSR ¶¶ 13-14, 20.

For all of these reasons, defendants' offense is among the most serious federal criminal offenses. When it enacted 18 U.S.C. § 2339B in 1996, Congress made specific findings about the serious threat posed by international terrorism. *See* Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) §§ 301(a)(1)-(7), PL 104-132, 110 Stat. 1214 (Apr. 24, 1996), note following 18 U.S.C. § 2339B (Findings and Purpose). Among other things, Congress found that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States," and "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id*. In 2015, Congress emphasized the serious threat posed by international terrorism when it increased the statutory maximum for a violation of § 2339B – including conspiracies and attempts – from 15 to 20 years. *See* Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline over Monitoring Act of 2015 § 704, PL 113-23, 129 Stat 268 (June 2, 2015). The serious nature of defendants' offense weighs in favor of a significant custodial sentence, as provided for under the plea agreements.

## II.  Defendants' histories and characteristics

Defendants' histories and characteristics are summarized in the PSRs, discussed further in Hussein's sentencing memo and attachments, and presumably will be discussed in Mohamed's sentencing memo. *See* Hussein's Memo at 9-23; *see also* Docs. 553, 555 (PSRs). The government does not dispute defendants' self-reported histories or deny they had difficult, traumatic, and tragic experiences growing up. The government believes the

stipulated sentencing caps in the plea agreements appropriately account for defendants' mitigating histories and characteristics.

Further variances are not warranted. The stipulated sentencing caps in the plea agreements already reflect significant downward variances from the sentencing guidelines range of 360 months to life and statutory maximum sentence of 20 years. Specifically, Mohamed's 16-year cap corresponds to a downward variance of more than 46% from the guidelines range and 20% from the statutory maximum. Hussein's 11-year cap corresponds to a downward variance of more than 63% from the guidelines range and 45% from the statutory maximum. Defendants provided the government with extensive mitigation information, including information about their histories and reports from Drs. Weller, Weine, and Akinsulure-Smith, before the parties started engaging in the most recent/final round of plea negotiations. The stipulated sentencing caps were reached after careful consideration of that information, as well as defendants' agreement to facilitate their removal from the United States following their imprisonment.

There is nothing new in Hussein's sentencing memorandum or Mohamed's recently disclosed reports that justifies an even more significant variance, much less a time-served sentence, which would require a downward variance of more than 80% from the guidelines range and more than 70% from the statutory maximum. For example, defendants' youth is not a basis for an extraordinary variance or downward departure under U.S.S.G. § 5H1.1 (and in any event, as stated above, defendants agreed not to seek any departures in their plea agreements). Research shows many individuals who have made or attempted to make hijrah and joined or attempted to join ISIS are young. The average age of adults who traveled from the United States to Syria or Iraq to join jihadist groups between 2011 and 2022 was 27 years old.[11] The average age of individuals who attempted to travel or successfully traveled from the United States to join jihadist groups in places other than

---

[11] *See, e.g.,* The Travelers: A Statistical Profile, *available at* https://extremism.gwu.edu/travelers (also stating that an estimated 12 to 30 minors traveled from the U.S. to Syria and Iraq). Jihadi John, born Mohammed Emwazi in 1988, wasn't much older than defendants when he joined ISIS. *See* PSR ¶ 11.

Syria or Iraq between 2011 and 2019, like defendants, was even younger – 23.5 years old.[12] Thus, defendants' age, like many of their characteristics, is common among jihadist travelers from the United States. And while their youth may have made them more susceptible to ISIS's influence and recruiting efforts, this was not an impulsive offense. *See* U.S.S.G. § 5H1.1. As discussed in the plea agreements, PSRs and above, this was an offense that took months and months of discussion and planning.

The amount of discussion and planning that went into their offense also illustrates why their alleged mental conditions do not support the extraordinary variances Hussein and, presumably, Mohamed, seek. *See* Doc. 215 (Hussein Rule 12.2(b) Notice (*withdrawn by Doc. 278*); Doc. 338 (Mohamed Rule 12.2(b) Notice). Defendants had no trouble communicating online or in person (in English) throughout the conspiracy. Mohamed's messages with the UCE show him easily texting back and forth, often responding within seconds of receiving a message.[13] Audio recordings of Mohamed and Hussein's meetings with the UCE show them talking about a wide range of topics with ease.[14] So do the videos from July 26, 2019, of defendants' car ride to the airport and Mohamed's post-arrest interview, excerpts of which were played at the evidentiary hearing on April 7, 2023. *See* Docs. 280, 283. This and lots of other evidence, plus the fact that defendants had jobs and cars, drove around town, had bank accounts, played video games, went to the mall, joined and worked out at a gym – all independently – show defendants were not impaired. They understood what they were doing and proactively took steps to propel their plans forward. *See, e.g.*, PSR ¶ 22. There is no evidence, other than their own statements to their experts, to support any claims of mental conditions that might bear on their guilt.[15]

---

[12] *See* Hughes *et al.*, The Other Travelers; American Jihadists beyond Syria and Iraq, *available at* https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/The%20Other%20Travelers%20Final.pdf .

[13] *See, e.g.*, Trial Exs. 51, 67, and 132 (messages between Mohamed and UCE) (copies of exhibits provided to the Court on Dec. 30, 2024).

[14] *See, e.g.*, Trial Exs. 265a, 265i, 265k, 266a, 266i, and 266k (excerpts of recording of June 24, 2019, meeting and corresponding transcript excerpts) (copies of exhibits provided to the Court on Dec. 30, 2024).

[15] Mohamed did not disclose Dr. Jennifer Weller's "Surrebutal Report" to the

Finally, defendants' lack of criminal history is not a basis for a more significant variance beyond the stipulated sentencing caps, nor is their criminal history category over-represented because of the terrorism enhancement in U.S.S.G. § 3A1.4. Courts have considered the reasoning behind U.S.S.G. § 3A1.4 and held that "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases").

### III.  Public policy considerations

The government believes the maximum sentences under the plea agreements appropriately address the public policy factors in 18 U.S.C. § 3553(a)(2). Significant custodial sentences of 16 years for Mohamed and 11 years for Hussein, coupled with their removal from the United States and a lifetime term of supervised release, reflect the seriousness of their offense, promote respect for the law, and provide just punishment. The requested sentences also will protect the public and afford adequate deterrence, both general deterrence and specific deterrence.

Significant custodial sentences are consistent with the sentencing guidelines and necessary to address the public policy concerns in § 3553(a), even if defendants did not ultimately achieve their goal of fighting for ISIS abroad. That's because "terrorism is different," as the Second Circuit explained:

> We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime

---

government until Friday, December 20, 2024. *See* Doc. 568. The timing of Mohamed's disclosure foreclosed any opportunity for the government to prepare a rebuttal report. In any event, Dr. Weller's latest report and its criticisms of the government's rebuttal expert, Dr. James Sullivan, do not establish that Mohamed suffers from a mental condition bearing on his guilt any more than her testimony at the evidentiary hearing on June 20, 2024 did. *See* Doc. 511.

> and the difficulty of deterring and rehabilitating the criminal. Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112–13 (2d Cir. 2019) (internal quotations, citations, and alterations omitted).

Defendants suggest that their eventual removal to Somalia warrants a shorter custodial sentence. *See* Doc. 575 at 30-33. The government agrees defendants' removal is relevant to the public policy considerations in § 3553(a)(2) and supports accepting the plea agreements rather than rejecting them and imposing longer sentences, as the PSR recommends. But the government does not agree their eventual removal justifies sentences below the stipulated sentencing caps and many of the points made in Hussein's sentencing memorandum and Dr. Shaul M. Gabbay's report seem to contradict defendants' stipulation to a judicial removal order and related factual admissions, as well as Mohamed's statements about support in Somalia. *See* Mohamed PSR ¶ 56; Docs. 540, 545.[16] Also, the stipulated removal orders do not require defendants to stay in Somalia and they can seek permission to move to other countries, perhaps where they have family (*see* Hussein PSR ¶ 53), so long as they do not return to the United States.

## IV.   Sentencing disparities

The government also believes the requested sentences will avoid unwarranted sentencing disparities. As Hussein states, it can be difficult to discern sentencing parity or consistency in terrorism cases. *See* Doc. 575 at 34. One reason is that sealed filings and classified information are more common in such cases and, therefore, it is hard to fully evaluate whether another case is similar or dramatically different. Nonetheless, there are a

---

[16] Contrary to Hussein's claim (Doc. 575 at 31), the government made plea offers (with less favorable sentencing caps) in August 2023 that would not have required them to stipulate to judicial removal orders. Defendants rejected those offers.

number of similar cases involving individuals who attempted to travel to join ISIS or another foreign terrorist organization that support the requested sentences, including:

- ***United States v. Tounisi*, No. 13-CR-00328 (N.D. Ill.): 180 months.** Tounisi made plans to travel to Syria to join the Al-Nusrah Front ("ANF") in 2012. Tounisi visited a purported recruitment website for ANF and emailed the listed contact person, who was actually an FBI employee. Tounisi was later arrested at O'Hare International Airport in 2013 attempting to board a flight to Turkey. The Seventh Circuit later affirmed Tounisi's 180 month sentence – the statutory maximum available at the time – as substantively reasonable. *United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018).

- ***United States v. Ahmed*, No. 17-CR-00378 (E.D.N.Y.): 153 months.** Ahmed, a United States citizen, traveled to Saudi Arabia in June 2017, purportedly to celebrate an Islamic religious holiday. Upon his arrival in Saudi Arabia, Ahmed attempted to travel to Syria to join ISIS. Ahmed was then apprehended in a Middle Eastern country during his attempted travel to ISIS-controlled territory.

- ***United States v. Raishani*, No. 17-CR-00421 (S.D.N.Y.): 240 months.** Raishani and a co-conspirator agreed to travel overseas to join and wage jihad for ISIS, with the co-conspirator to depart first. On October 30, 2015, the co-conspirator flew from John F. Kennedy International Airport to Istanbul, Turkey, where he planned to cross into Syria to join and fight for ISIS. Raishani helped coordinate the co-conspirator's transportation to the airport and rode with him.

- ***United States v. Alebbini*, No. 17-CR-00071 (S.D. Ohio): 180 months.** Alebbini was arrested at the Cincinnati/Kentucky International Airport, as he was attempting to travel to Turkey and then Syria to join ISIS. Alebbini told relatives, who were pleading with him not to go, "Do you think I am a criminal," "I am a terrorist," and "I am mujahid." Alebbini previously told a

friend he wanted to be a "inghimasi soldier," a particularly lethal type of suicide bomber.

- ***United States v. Abdin***, **No. 17-CR-00283 (D.S.C.): 240 months.**
  Abdin was arrested at the Charleston International Airport, as he was attempting to travel to Jordan, and ultimately to Syria or Egypt, to join ISIS. Abdin had extensive communications with an undercover FBI employee in which he pledged to wage jihad. Abdin also purchased guns and sent pictures of himself practicing shooting at a gun range to the undercover employee.

Even some of the cases Hussein highlights in his sentencing memorandum are close to the requested sentences. *See* Doc. 575 at 35-39 (listing at least six cases with sentences of 10 years or more). However, most of Hussein's cases are not good comparators for several reasons. The government carefully reviewed the public dockets for the international terrorism cases on Hussein's list. The dockets show that many of Hussein's cited cases involve defendants who cooperated with the government and received significant downward departures under U.S.S.G. § 5K1.1; some even pleaded guilty pre-indictment. Notably, the defendant in *United States v. Young* cooperated with the government, received a § 5K1.1. downward departure, and still received a 12-year sentence.

In addition, several of Hussein's referenced cases involve charges other than 18 U.S.C. § 2339B, with lower statutory maximum sentences and different sentencing guidelines calculations. For example, in *United States v. Conley*, the defendant – who pleaded guilty pre-indictment and cooperated with the government – was convicted of violating 18 U.S.C. § 371, which has a five-year statutory maximum. Several of the § 2339B cases Hussein cites pre-date 2015, when Congress increased the statutory maximum sentence from 15 to 20 years. And in one § 2339B case, *United States v. Alhaggagi*, the Ninth Circuit held the terrorism enhancement did not apply, which resulted in a significantly lower sentencing guidelines range and reduced sentence (the district court initially sentenced *Alhaggagi* to 188 months).

In sum, a review of recent § 2339B cases, including attempt and conspiracy cases, shows sentences of 16 and 11 years will not cause unwarranted sentencing disparities. It also shows that any disparities between this case and the cases cited by Hussein are warranted.

**Conclusion**

For the foregoing reasons, the government respectfully asks the Court to accept the plea agreements and impose custodial sentences of 16 years for Mohamed and 11 years for Hussein, and order both defendants be removed to Somalia after their custodial sentences.

Respectfully submitted this 3rd day of January, 2025.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/M. Bridget Minder*
M. Bridget Minder
Assistant U.S. Attorney

Copy of the foregoing served electronically or by other means this 3rd day of January, 2025 to:

All ECF recipients